**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ALAN J. BAUER, | : |
| | : |
|     Plaintiff, | :    Civil Action No.:    11-1267 (RC) |
| | : |
| v. | : |
| | : |
| MAVI MARMARA *et al.*, | : |
| | : |
|     Defendants. | : |

## MEMORANDUM OPINION

### I. INTRODUCTION

This lawsuit arises from the Israeli naval blockade of the Gaza Strip in 2006. The plaintiff claims to have identified several ships that violated the blockade in order to provide assistance to terrorist groups in the Palestinian territories. The plaintiff thus brought suit under the Neutrality Act, a law that was enacted in 1794 and has rarely been invoked since. Because the Neutrality Act lacks a private cause of action, the court dismisses the case.

### II. LEGAL AND FACTUAL BACKGROUND

#### A. The Neutrality Act of 1794

The Neutrality Act bears an impeccable historical pedigree: "The act of 1794, which has been generally recognized as the first instance of municipal legislation in support of the obligations of neutrality, and a remarkable advance in the development of international law, was recommended to congress by President Washington in his annual address on December 3, 1793, was drawn by Hamilton, and passed the senate by the casting vote of Vice President Adams." *The Three Friends*, 166 U.S. 1, 52–53 (1897). The Neutrality Act was designed to keep the United States from getting dragged into the conflict between England and France. Thomas H. Lee, *The Safe-Conduct Theory of the Alien Tort Statute*, 106 COLUM. L. REV. 830, 847 (2006)

(describing the "young Republic's neutrality crisis" as the Founders precariously navigated "between the Scylla of Britain and the Charybdis of France."). Thus, the Act appears to be a legislative enactment of President Washington's warning—made famous in his farewell address—that the young nation should remain free from entangling alliances. George Washington, Farewell Address (Sept. 19, 1796), reprinted in S. Doc. No. 106-21 (2000) ("Why, by interweaving our destiny with that of any part of Europe, entangle our peace and prosperity in the toils of European ambition, rivalship, interest, humor or caprice? . . . After deliberate examination, with the aid of the best lights I could obtain, I was well satisfied that our country, under all the circumstances of the case, had a right to take, and was bound in duty and interest to take, a neutral position.").

      The Neutrality Act is one of many "bounty" or "informer" statutes that were passed in the early days of the Republic. These provisions promised a financial reward to citizens who came forward with information of wrongdoing. *See generally Vt. Agency of Natural Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 774–79 (2000) (providing a lengthy history of informant statutes). The bounty mechanism was born of necessity, as the then-nascent federal government often lacked sufficient means to investigate or prosecute illegal activity. *U.S. ex rel. Marcus v. Hess*, 317 U.S. 537, 560 (1943) (Jackson, J., dissenting) (describing "law-enforcement in a nation which had not yet established a Federal Department of Justice, which did not then have a Federal Bureau of Investigation, or a Treasury investigating force, and in which the activities of the Federal Government were so circumscribed that they had not been found necessary."); Pamela H. Bucy, *Information as a Commodity in the Regulatory World*, 39 HOUS. L. REV. 905, 910 (2002) (explaining that "in colonial America, informer actions were needed because there was no police force or prosecuting authority"); Evan Caminker, *The Constitutionality of Qui Tam*

*Actions*, 99 YALE L.J. 341, 341 n.1 (1989) (noting that "prior to the growth of the modern executive, the responsibility for enforcing legal obligations necessarily fell to private citizens [through *qui tam* actions] rather than public officers").

Congress's reliance on the "bounty" or "informer" mechanism waned somewhat in the early to mid-nineteenth century, in response to the steady expansion of the federal government's prosecutorial machinery. Thus, few of these statutes remain on the books; even fewer are invoked in today's courts. *See* Evan Caminker, *The Constitutionality of Qui Tam Actions*, 99 YALE L.J. 341, 341 n.1 (1989) ("Most early qui tam statutes have long been repealed; of those remaining, most lie essentially dormant."). Of course, this would not be the first time that an enterprising plaintiff has resuscitated a long-dormant statute. In *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980), the plaintiffs rescued the Alien Tort Statute—passed by the first Congress in 1789—from nearly two hundred years of disuse. This case presents a similar question: namely, whether the Neutrality Act of 1794 may be invoked by a plaintiff today without the government's involvement.

### B. Factual Background

Dr. Bauer is an American citizen who was injured in a 2002 terrorist attack that was committed in Jerusalem. According to the complaint, the terrorist organization Hamas seized power in the Gaza Strip in 2007 and began carrying out attacks against civilian targets in Israel soon thereafter. Israel responded by imposing a naval blockade on the Gaza Strip. The plaintiff alleges that "anti-Israel organizations" in the United States and other countries retaliated by organizing efforts to breach the blockade and to provide support to Hamas. Compl. ¶¶ 9–11.

The plaintiff alleges that several organizations and individuals in the U.S. (such as the "Free Gaza Movement" and the "U.S. Boat to Gaza Project") raised funds that were ultimately used to equip the defendant vessels with the means to commit hostilities against the state of

Israel. *Id*. ¶¶ 11–16.[1] Dr. Bauer relayed this allegation to the Attorney General. *Id*. ¶¶ 4, 5; *see id.*, Ex. A. The plaintiff then filed suit under a forfeiture provision of the Neutrality Act, 18 U.S.C. § 962, which provides as follows:

> Whoever, within the United States, furnishes, fits out, arms, or attempts to furnish, fit out or arm, any vessel, with intent that such vessel shall be employed in the service of any foreign prince, or state, or of any colony, district, or people, to cruise, or commit hostilities against the subjects, citizens, or property of any foreign prince or state, or of any colony, district, or people with whom the United States is at peace; or
>
> Whoever issues or delivers a commission within the United States for any vessel, to the intent that she may be so employed
>
> Shall be fined under this title or imprisoned not more than three years, or both.
>
> Every such vessel, her tackle, apparel, and furniture, together with all materials, arms, ammunition, and stores which may have been procured for the building and equipment thereof, shall be forfeited, one half to the use of the informer and the other half to the use of the United States.

The plaintiff alleges that the defendant vessels are subject to forfeiture under this provision, and that as an "informer" he is entitled to one half of the proceeds should the ships be seized. Compl. ¶¶ 3, 6.

The plaintiff asks that the court enter an order decreeing that these vessels are now U.S. property. *Id.* at 7 (Prayer for Relief) (asking for a decree of forfeiture). The court asked for the views of the Justice Department under 28 U.S.C. § 517, and the government argues that the plaintiff's claim should be dismissed for failure to state a claim. The court agrees.

---

[1] In all likelihood, the organizations would contest this characterization; for example, the Free Gaza Movement claimed that its boats were equipped to achieve purely humanitarian ends. *See generally* Isabel Kershner, *Advocates for Gaza Challenge Blockade*, N.Y. TIMES (Oct. 29, 2008) ("Among the 27 activists and crew members of the vessel that sailed from Cyprus were Mairead Maguire, a Nobel Peace Prize winner who led a campaign against violence in Northern Ireland; Mustafa Barghouti, an independent Palestinian legislator from the West Bank; two Israeli citizens; and individuals from various countries including Britain, Italy and the United States.").

## III. ANALYSIS

### A. Subject-Matter Jurisdiction

The judicially created doctrine of standing derives from Article III of the U.S. Constitution, which confines the federal courts to adjudicating actual "Cases" and "Controversies." The doctrine "is built on a single basic idea—the idea of separation of powers." *Allen v. Wright*, 468 U.S. 737, 752 (1984). Thus, a showing of standing "is an essential and unchanging" predicate to any exercise of this court's jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). And a federal court should first determine that it has jurisdiction over a case before ruling on the merits. *Al-Zahrani v. Rodriguez*, 669 F.3d 315, 317–18 (D.C. Cir. 2012).

Ordinarily, to show standing a plaintiff must establish "three constitutional minima": (1) that the party has suffered an "injury in fact," (2) that the injury is "fairly traceable" to the challenged action of the defendant, and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 174 (D.C. Cir. 2012) (citing *Lujan*, 504 U.S. at 560–61) (internal quotation marks omitted). At first glance, it would appear that the plaintiff has failed to meet the first two prongs of this test. After all, the plaintiff does not assert that he suffered any particularized injury that stems from the Gaza blockade and its aftermath, nor does he allege that any such injury could be fairly traceable to the defendants' actions.

But failure to meet this test does not necessarily deprive the court of subject-matter jurisdiction. Although the court has "packaged the requirements of constitutional 'case' or 'controversy' somewhat differently in the past 25 years—an era rich in three-part tests—the point has always been the same: whether a plaintiff 'personally would benefit in a tangible way from the court's intervention.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 n.5

(1998) (citing *Warth v. Seldin*, 422 U.S. 490, 505 (1975)). And "history is particularly relevant to the constitutional standing inquiry," because "Article III's restriction of the judicial power to 'Cases' and 'Controversies' is properly understood to mean 'cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process.'" *Stevens*, 529 U.S. at 774 (citing *Steel Co.*, 523 U.S. at 102). History is kind to the plaintiff's claim: immediately after the framing of the Constitution, the First Congress enacted a considerable number of "informer" statutes. *Id.* at 776. Because "traditional ways of conducting government give meaning to the Constitution," *Mistretta* v. *United States*, 488 U.S. 361, 401 (1988), the rich history of informer statutes is "well nigh conclusive" as to their constitutionality. *Stevens*, 529 U.S. at 777; *see Myers v. United States,* 272 U.S. 52, 175 (1926) ("contemporaneous legislative exposition of the Constitution . . . acquiesced in for [many] years, fixes the construction to be given its provisions"); *Wisconsin v. Pelican Ins. Co.*, 127 U.S. 265, 297 (1888) (noting that legislation "passed by the First Congress assembled under the Constitution, many of whose members had taken part in framing that instrument, . . . is contemporaneous and weighty evidence of its true meaning.").

Thus, *Lujan* described several exceptions to the ordinary tripartite inquiry. In particular, *Lujan* noted that Article III standing would exist in "the unusual case in which Congress has created a concrete private interest in the outcome of a suit against a private party for the government's benefit, by providing a cash bounty for the victorious plaintiff." 504 U.S. at 572–73. The Court explicitly reaffirmed this reasoning in *Stevens*, holding that an individual who brings suit under a similarly structured "bounty" statute—the False Claim Act's *qui tam* provision[2]—has Article III standing. 529 U.S. at 773–74. The Court reasoned that the

---

[2] *Qui tam* is shorthand for "*qui tam pro domino rege quam pro se ipso in hac parte sequitur*," a Latin phrase which translates to "who pursues this action on our Lord the King's behalf as well

6

government suffers a cognizable injury when it is defrauded, and that the False Claims Act's *qui tam* provision may be construed as a partial assignment of the government's claim to damages. *Id.* ("We believe, however, that adequate basis for the relator's suit for his bounty is to be found in the doctrine that the assignee of a claim has standing to assert the injury in fact suffered by the assignor.  The [False Claims Act] can reasonably be regarded as effecting a partial assignment of the Government's damages claim . . . . We conclude, therefore, that the United States' injury in fact suffices to confer standing on [the qui tam relator].").

Whether the Neutrality Act contains a private cause of action is a question that touches upon the merits—that question does not implicate this court's subject-matter jurisdiction.  *Bond v. United States*, 131 S. Ct. 2355, 2363 (2011) ("[T]he question whether a plaintiff states a claim for relief 'goes to the merits' in the typical case, not the justiciability of a dispute." (quoting *Steel Co.*, 523 U.S. at 89 (explaining that any analysis of a plaintiff's alleged cause of action must be conducted after "resolving a dispute concerning the existence of an Article III case or controversy"))); *see Muir v. Navy Fed. Credit Union*, 529 F.3d 1100 (D.C. Cir. 2008) (noting—albeit in dicta—that "the question of whether Muir has a cause of action under the [relevant statute] is a merits question"); *but see Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 803 n.8 (D.C. Cir. 1984) (Bork, J. concurring) ("A plaintiff who has no cause of action is . . . not entitled to 'invoke the power of the court.'  He is not entitled to a pronouncement on the legal merits of his claim.  In that respect he is more like a plaintiff who lacks standing than he is like a plaintiff facing a motion to dismiss for failure to state a claim . . . . In these circumstances, whether a

---

ashis own." *Rockwell Intern. Corp. v. United States*, 49 U.S. 457, 463 n.2 (2007).  This provision allows individuals who relate certain information about fraud to bring suit in the government's name and share in any proceeds that are ultimately recovered. *U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 647 (D.C. Cir. 1994).

cause of action exists is a threshold issue that involves a question of the limits of judicial powers."). Accordingly, the court turns to the merits.

### B. Legal Standard for Failure to State a Claim

All that the Federal Rules of Civil Procedure require of a complaint is that it contain a "short and plain statement of the claim" in order to give the defendant fair notice of the claim and the grounds upon which it rests. FED. R. CIV. P. 8(a)(2), *see Erickson v. Pardus*, 551 U.S. 89, 93 (2007). Ordinarily, the sufficiency of a complaint is tested by a motion brought under Rule 12(b)(6), which tests whether a plaintiff has properly stated a claim. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). But if the failure to state a claim is patent, "it is practical and fully consistent with plaintiffs' rights and the efficient use of judicial resources" for the court to act on its own initiative and dismiss the action. *Jaeger v. United States*, 2006 WL 1518938, at *1 (D.D.C. May 26, 2006) (citing *Baker v. Director, U.S. Parole Comm'n*, 916 F.2d 725, 727 (D.C. Cir. 1990) (per curiam) (noting that a "district court may dismiss a complaint *sua sponte* for failure to state a claim if it is patently obvious that the plaintiff cannot prevail")). And absent a viable cause of action, the court must dismiss for failure to state a claim. *Ali v. Rumsfeld*, 649 F.3d 762 (D.C. Cir. 2011) (affirming dismissal under 12(b)(6) when the plaintiff brought suit under a 1790 statute that did not contain a private cause of action under the circumstances alleged).

### C. 18 U.S.C. § 962 Lacks an Express Cause of Action

The plaintiff concedes that the Neutrality Act does not provide an express cause of action. Pl.'s Response at 3. The Court indicated as much in *Stevens*, observing that there were only three *qui tam* or "bounty" statutes (in addition to the False Claims Act) that remain in the

U.S. code.[3] 529 U.S. at 768 n.1. The Court noted that a few of these statutes contain an explicit or express private right of action, whereas some do not:

> Three other qui tam statutes, all also enacted over 100 years ago, remain on the books. *See* 25 U.S.C. § 81 (providing cause of action and share of recovery against a person contracting with Indians in an unlawful manner); [25 U.S.C.] § 201 (providing cause of action and share of recovery against a person violating Indian protection laws); 35 U.S.C. § 292(b) (providing cause of action and share of recovery against a person falsely marking patented articles); *cf.* 18 U.S.C. § 962 (providing for forfeiture to informer of share of vessels privately armed against friendly nations, *but not expressly authorizing suit by informer*); 46 U.S.C. § 723 (providing for forfeiture to informer of share of vessels removing undersea treasure from the Florida coast to foreign nations, but not expressly authorizing suit by informer).[4]

*Id.* (emphasis added). The plaintiff brings suit under 18 U.S.C. § 962—one of the statutes that lacks an express private cause of action.

The *Stevens* Court's conclusion may be independently verified by comparing the language of these various statutes. In essence, the Court divided these provisions into two categories: (1) statutes that describe who may bring suit (and how), and (2) statutes that are silent on the matter. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 283–84 (2002) ("The question whether Congress . . . intended to create a private right of action [is] definitively answered in the negative where a statute by its terms grants no private rights to any identifiable class[,] and . . . a plaintiff suing under an implied right of action still must show that the statute manifests an intent to create not just a private *right* but also a private *remedy*.") (internal citations and quotations omitted).

---

[3] Two of these provisions have subsequently been removed. *See* footnote 4, *infra*.

[4] "It is worth noting that the first of these three, 25 U.S.C. § 81, has been entirely redrafted, and the *qui tam* provision removed." *Stalley v. Methodist Healthcare*, 517 F.3d 911, 917 (6th Cir. 2008). Moreover, 35 U.S.C. § 292, which once provided a *qui tam* action for certain patent cases, was recently repealed by the Leahy–Smith America Invents Act, Pub. Law 112–29, § 16(b)(4). *See Rogers v. Conair Corp.*, 2012 WL 1443905, at *1 (E.D. Pa. Apr. 25, 2012).

The clearest example of a statute falling in the first category is the False Claims Act, which states: "A person may bring a *civil action* for a violation of section 3729 for the person and for the United States Government. The action shall be brought *in the name of the Government*." 31 U.S.C. § 3730(b)(1) (emphasis added). Similarly, 25 U.S.C. § 81 (which was cited by the Court but subsequently repealed) once stated: "All contracts or agreements made in violation of this section shall be null and void, and all money or other thing of value paid . . . *may be recovered by suit in the name of the United States* in any court of the United States, regardless of the amount in controversy; and one-half thereof shall be *paid to the person suing for the same*, and the other half shall be paid into the Treasury for the use of the Indian or tribe by or for whom it was so paid." (emphasis added). Under 25 U.S.C. § 201, "All penalties which shall accrue under Title 28 of the Revised Statutes *shall be sued for and recovered in an action in the nature of an action of debt*, in the name of the United States, . . . one half to the use of the informer and the other half to the use of the United States . . . ." (emphasis added). Finally, 35 U.S.C. § 292(b) (also repealed) once contained this provision: "*Any person may sue for the penalty*, in which event one-half *shall go to the person suing* and the other to the use of the United States." (emphasis added).

Falling on the other side of the ledger is 46 U.S.C. § 723 (which is now codified at 46 U.S.C. § 80103(b)). That provision reads: "A vessel transporting property described in subsection (a) to a foreign port may be seized by, and forfeited to, the United States Government. A forfeiture under this subsection accrues half to the informer and half to the Government." This provision contains no language indicating who may sue, how suit may be brought, or in whose name the suit should be filed. Thus, no express private cause of action exists. *Stevens*, 529 U.S. at 768 n.1.

The same conclusion must be reached when reading § 962, which states: "Every such vessel, her tackle, apparel, and furniture, together with all materials, arms, ammunition, and stores which may have been procured for the building and equipment thereof, shall be forfeited, one half to the use of the informer and the other half to the use of the United States." Unfortunately for the plaintiff, § 962 contains no mention of who may bring suit, or how, or in whose name. There being no statutory language on this point, this court will reaffirm that § 962 lacks an express private cause of action.

### D. The Court Will Not Imply a Private Cause of Action

The plaintiff insists that a private cause of action may be judicially implied. But "courts today rarely create implied private rights of action; courts generally deem it Congress's prerogative to make that decision." *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust ex rel. Federal Nat. Mortg. Ass'n v. Raines*, 534 F.3d 779, 793 (D.C. Cir. 2008). "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001) (citing *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15 (1979)); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 193 (2005) ("Whether a statute supplies a cause of action is a matter of statutory interpretation . . . [a court's] role, then, is not to provide such remedies as are necessary to make effective the congressional purpose expressed by a statute, but to examine the text of what Congress enacted into law.") (citation and alterations omitted).

The quest for congressional intent usually begins and ends with the text and structure of the statute. *Alexander*, 532 U.S. at 288. Yet the meaning of the text may be understood best when viewed through a historical lens. *See Canning v. NLRB*, 705 F.3d 490, 495 (D.C. Cir. 2013) ("When interpreting a constitutional provision, we must look to the natural meaning of the

11

text as it would have been understood at the time of the ratification of the Constitution." (citing *District of Columbia v. Heller*, 554 U.S. 570 (2008))); *see Stevens*, 529 U.S. at 778 (deeming the lengthy history of congressional *qui tam* statutes "well nigh conclusive" with respect to their constitutionality). When interpreting a statute of this vintage, therefore, the statutory language must be read against "the ambient law of the era." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 714 (2004) (consulting the "historical paradigms familiar when [the Alien Tort Statute] was enacted [in 1790]" to determine whether a cause of action existed); *id.* at 719–20 (finding a cause of action implicit within the Alien Tort Statute of 1790—despite the absence of any statutory provision—by concluding that "[t]here is too much in the historical record to believe that Congress would have enacted the ATS only to leave it lying fallow indefinitely.")

At the time the Neutrality Act was drafted, contemporaneous informer statutes were construed by some courts to allow an informer to bring suit. At common law, a civil action for debt was allowed "whenever a penalty was given by statute, yet no appropriation or method of recovery is prescribed by the act." *United States v. Tilden*, 28 F. Cas. 179 (C.C.D. Mass. 1859) (Curtis, J.) ("It is laid down by Mr. Justice Story in [*Ex parte Marquand*, 16 F. Cas. 776 (C.C.D. Mass. 1815)], that at common law, wherever a penalty is given, and no appropriation or method of recovery is prescribed by the act, an action or information of debt lies, and not an indictment."); *see* 3 WILLIAM BLACKSTONE, COMMENTARIES 159-60 (1768) ("[F]orfeitures created by statute are given at large, to any common informer; or, in other words, to any such person or persons as will sue for the same: and hence such actions are called popular actions.").

By way of example, in *Adams v. Woods*, the plaintiff brought suit under a 1790 statute that "prohibit[ed] the carrying on the slave trade from the United States to any foreign place or country." 6 U.S. (2 Cranch) 336, 336 (1805) (Marshall, C.J.). That statute contained an

informer provision, which indicated that defendants "shall forfeit and pay the sum of two thousand dollars; one moiety thereof to the use of the United States, and the other moiety thereof to the use of him or her who shall sue for and prosecute the same." *Id.*[5] Chief Justice Marshall indicated that the informer could file a civil action for the penalty. *Id.* ("Almost every fine or forfeiture under a penal statute, may be recovered by an action of debt as well as by information.").

More relevant still is the case of *United States v. Skinner*, 27 F. Cas. 1123 (C.C.D.N.Y. 1818) (No. 16,309). There, a Neutrality Act prosecution was initiated by an informer. The defendants argued that the case should be dismissed because the prosecution had been commenced without any governmental participation. The court disagreed, concluding: "any individual might complain of the infraction of a law, and he considered it his duty to award a warrant whenever complaint was made to him on oath of a crime's being committed, whether such warrant were applied for by the district attorney or any other person." *Id.*; *see also* Harold J. Krent, *Executive Control Over Criminal Law Enforcement: Some Lessons From History*, 38 AM. U. L. REV. 275, 294–95 (1989).

By the 20th century, courts retreated from this view, holding instead that "[t]he enforcement of the neutrality laws of the United States is of necessity under the control of the government of the United States," and that an informant could not independently proceed under 18 U.S.C. § 962. *Olivier v. Hyland*, 186 F. 843, 843 (5th Cir. 1911) (issuing a one-paragraph order indicating that an informer could not proceed when the government intervened and

---

[5] Today's jurisprudence would recognize that the statute under consideration in *Adams v. Woods* contains language evincing Congress' intent to create an express private cause of action. Unlike the Neutrality Act, the provision considered by Chief Justice Marshall contains language indicating who may initiate and prosecute the suit. Thus, *Adams v. Woods* illustrates how informer statutes were brought—but it is not on all fours with this case.

disavowed the litigation); *The Venus*, 180 F. 635, 635 (D.C. La. 1910) ("express[ing] no opinion" whether the informant had the right to institute an informer act without the government's participation and dismissing the case because the United States intervened and moved to dismiss the case); *see also The Confiscation Cases*, 74 U.S. 454, 462 (1868) (under a similar Civil War-era statute providing for the condemnation of vessels used in support of an insurrection, concluding that the informer could not proceed independently of the government). Thus, the historical evidence indicates that an informant's power to bring suit has diminished over time.

In all, the historical inquiry does not conclusively resolve the matter. *See Georgia v. Randolph*, 547 U.S. 103, 123 (2006) (Stevens, J., concurring) ("The study of history for the purpose of ascertaining the original understanding of constitutional provisions is . . . usually relevant but not necessarily dispositive."). Yet even if historical custom may have allowed a private suit at the time it was drafted, "the prevailing conception of the common law has changed since 1789 in a way that counsels restraint [today]." *Sosa v. Alvarez-Machain*, 542 U.S. at 714; *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) ("At the time a statute is enacted, it may have a range of plausible meanings. Over time, however, subsequent acts can shape or focus those meanings"). The Supreme Court has more recently directed courts to be cautious when recognizing a private right of action, explaining that without a clear demonstration of congressional intent, "a claim does not exist and courts may not create one." *Alexander*, 532 U.S. at 286–87. Nowadays, "[t]he creation of private causes of action in the absence of an express legislative statement is disfavored." *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1033 (D.C. Cir. 2004).[6] And absent any "compelling and unusual

---

[6] The plaintiff points to a 60-year-old footnote in *U.S. ex rel. Marcus v. Hess*, 317 U.S. 537 (1943), in which the Court suggested that "[s]tatutes providing for a reward to informers which do not

14

circumstances" requiring a deviation from this rule, *see McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066, 1078 (D.C. Cir. 2012), this court will refrain from implying a private cause of action here.

This conclusion is buttressed by two important issues. First, § 962 implicates foreign relations, an area that is the sole responsibility of the federal government. *See United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936); *Olivier v. Hyland*, 186 F. 843, 843 (5th Cir. 1911) (per curiam) ("[t]he enforcement of the neutrality laws of the United States is of necessity under the control of the government of the United States"). And courts should be "particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs." *Sosa v. Alvarez-Machain*, 542 U.S. at 714 (limiting the circumstances in which a private cause of action may be read into an 18th-century statute due to "potential implications for the foreign relations of the United States."); *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 210 (D.C. Cir. 1985) (Scalia, J.) ("It would be doubly difficult to find a private damage action within [a separate provision of] the Neutrality Act, since this would have the practical effect of eliminating prosecutorial discretion in an area where the normal desirability of such discretion is vastly augmented by the broad leeway traditionally accorded the Executive in matters of foreign affairs."); *Smith v. Reagan*, 844 F.2d 195, 201 (4th Cir. 1988) (being weary of

---

specifically either authorize or forbid the informer to institute the action are construed to authorize him to sue." *Id.* at 541 n.4. The Court later categorized this observation as nonbinding "dictum," *Stevens*, 529 U.S. at 777 n.7, and the government points out that the *Marcus v. Hess* footnote is flawed because it cites to a single case (*Adams v. Woods*) in which "the statute *expressly authorized* [informant] suits." Govt's Reply at 4. The court deems the dictum in this footnote to be a prime example of the Court's "previous willingness to imply a cause of action where Congress has not provided one," from which the Court has emphatically "retreated." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 67 n.3 (2001); *see Alexander*, 532 U.S. at 286–87 ("Having sworn off the habit of venturing beyond Congress's intent, we will not accept respondents' invitation to have one last drink."). Accordingly, the court is neither bound nor persuaded by the dictum in this footnote, and it rejects the plaintiff's argument.

"tread[ing] on matters of foreign policy which have long been recognized as the exclusive province of the political branches," courts "must be especially certain of congressional intent before inferring a private cause of action" in the realm of foreign affairs).

Second, the forfeiture proceeding is a penalty for acts that are criminal in nature. *See* 18 U.S.C. § 962 (imposing up to three years of prison for an individual who "furnishes, fits out, arms, or attempts to furnish, fit out or arm, any vessel, with intent that such vessel shall be employed in the service of any foreign prince, or state, or of any colony, district, or people, to cruise, or commit hostilities against the subjects, citizens, or property of any foreign prince or state, or of any colony, district, or people with whom the United States is at peace"). Although the forfeiture proceeding is not itself criminal in nature, *see The Three Friends*, 166 U.S. 1 (1897); such a proceeding may only be imposed as a penalty for criminal activity. Private rights of action are "extremely unlikely" to be found in "statutory language customarily found in criminal statutes." *Sanchez-Espinoza v. Reagan*, 770 F.2d at 210.[7]

---

[7] Finally, the court notes that the plaintiff's proposed construction of § 962 could raise constitutional concerns. Ordinarily, an informant statute must provide the Executive branch with means to control the litigation; otherwise, individual litigants might derogate the Executive's duty to "take Care that the laws be faithfully executed." U.S. CONST. art. II, § 3; *see Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 754 (5th Cir. 2001) (en banc) ("Any intrusion by the qui tam relator in the Executive's Article II power is comparatively modest, especially given the control mechanisms inherent in the FCA to mitigate such an intrusion and the civil context in which qui tam suits are pursued. Hence, the qui tam portions of the FCA do not violate the constitutional doctrine of separation of powers by impinging upon the Executive's constitutional duty to take care that the laws are faithfully executed under Article II of the Constitution."); *U.S. ex rel. Taxpayers Against Fraud v. General Elec. Co.*, 41 F.3d 1032, 1041 (6th Cir. 1994) ("The qui tam provisions adopted by Congress do not contradict the constitutional principle of separation of powers. Rather, they have been crafted with particular care to maintain the primacy of the Executive Branch in prosecuting false-claims actions, even when the relator has initiated the process."); *U.S. ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 755 (9th Cir. 1993) ("[T]he FCA gives the Attorney General sufficient means of controlling or supervising relators to satisfy separation of powers concerns . . . . We conclude that because the Executive Branch has power, albeit somewhat qualified, to end qui tam litigation, it is not significant that it cannot prevent its start."); *see also U.S. ex rel. Kreindler v. United Techs.*, 985 F.2d 1148, 1155 (2d Cir. 1993) (holding that the qui tam provisions "do not usurp the executive litigating function because the statute gives the executive branch substantial control over the litigation"). Like all statutes, the Neutrality Act

In sum, 18 U.S.C. § 962 lacks an express private cause of action, and the court declines the plaintiff's invitation to imply one. Accordingly, this case must be dismissed for the plaintiff's failure to state a claim upon which relief may be granted.

### IV. CONCLUSION

For the foregoing reasons, the court dismisses this case. An order consistent with this memorandum opinion is separately issued this 18th day of April, 2013.

RUDOLPH CONTRERAS
United States District Judge

---

must be construed to remove any doubts about its constitutionality. *United States v. Jin Fuey Moy*, 241 U.S. 394, 401 (1916) ("A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score.") (Holmes, J.); *see also Ashwander v. TVA*, 297 U.S. 288, 348 (1936) (Brandeis, J., concurring).